case for argument. Very good. Mr. McPherson. May it please the court. My name is Rick McPherson. I'm a staff attorney with the Minnesota Disability Law Center and I'm representing the appellant Barry Segal. Mr. Segal works for a living. Because he's deafblind, he needs Metro Transit's buses to get to his work and to medical care. He takes his work very seriously and plans to arrive early every day so he can be prepared to do his job. But he can only access buses reliably and safely if Metro Transit drivers comply with the Department of Transportation regulations by stopping and announcing the bus routes so he can identify which bus is his. The question before this court is whether evidence of 150 violations of Department of Transportation section 37.167C, the stop and announce regulation, is sufficient to establish a jury question whether Metro Transit failed to provide meaningful access for Mr. Segal to transportation services. The district court... Counsel, this is Judge Loken. Is meaningful access a question of fact or law and what Supreme Court or a circuit controlling case has established that? I believe it's a question of fact and that was... That's what the court held in the Argini decision. Says that it's extremely fact intensive, which means it should be decided by a jury. And that in our view, the jury would need to be instructed about the Department of Transportation regulations and would be able to consider violations of those regulations as evidence as to whether meaningful access was provided. As this court held in the Hillesheim decision, the regulations implementing the Americans with Disabilities Act provide the standards for measuring compliance with the act. In this case, I'm sorry, in the Hillesheim case, this court decided that evidence of whether the store was accessible. In Mr. Segal's case, there's evidence of 10 times more violations in the record. We are not... Mr. Segal is not asking this court to reconsider its decisions concerning the meaningful access standard. Instead, he asked this court to continue to recognize the principle that the regulations do provide the standards to measure whether metric transit provided him with meaningful access. The Department of Transportation regulations require buses to stop and identify the bus route. This sets a minimum requirement for meaningful access for bus service for people who are blind and deaf-blind. Identifying buses that arrive at a bus stop is an essential element of bus service. People need to know whether a bus that arrives is the bus they intend to take. The parties and Metro Transit's own expert witness all agree that the only way to communicate the bus route to a person who's deaf-blind is for the bus driver to stop and announce the route. This is not difficult or burdensome to do. Mr. Segal's not requesting any unusual or unique accommodation. He only asks that Metro Transit meet the same standard that the Department of Transportation requires every other transit authority to meet. Buses stopping at the sign where the people who are waiting for the bus stand and announce the route. Unlike the Loy case and the Ball case, which this court has previously decided, there is no alternative method that Metro Transit used or could have used to effectively communicate the bus route to Mr. Segal. The number of violations in this case is sufficient to allow a jury to find that Metro Transit failed to provide meaningful access. On 150 occasions, which on an average was once a week for three years, Metro Transit bus drivers did not stop close enough to the T sign to communicate the bus route to Mr. Segal or on many occasions, it did not even stop at all. Even Metro Transit's expert witness agreed that violations occurring once a week is unacceptable. Mr. Segal never knew from day to day when he went to the bus stop whether the bus would stop for him or whether he might be exposed to injury or danger by having to chase the bus. There are several video examples of these incidents in the appendix at A552-555 and 10732. A large number of these incidents that Mr. Segal reported were what we are calling second bus incidents where the bus driver pulled or a second bus arriving at the bus stop pulled around the first bus that had already stopped there without stopping and consequently did not or could not communicate the route to Mr. Segal. This case is not a strict liability case. The ADA regulations provide defenses to violation of the regulations including the undue burden defense. Metro Transit did not claim that complying with the regulation in this case would result in an undue burden. It provided no evidence of any burden at all that the complying with regulation would cause. In fact, it is their policy. It's what drivers are supposed to do. Mr. Segal's case is not based on a single violation. He asserts evidence, as I said, of 150 violations over three years. He is not asking this court to rule that a single violation of the regulation is sufficient to establish liability. Instead, he asks this court to determine whether 150 violations is sufficient. Your Honor, at this point, I would reserve the remaining time for my rebuttal. Thank you. Thank you. Ms. Ellingstead? Thank you. May I please the court? My name is Susan Ellingstead of Lockridge, Grinnell-Mellon, and I represent the APALE, the Metropolitan Council, and its division, Metro Transit, which provides rail and fixed bus route services throughout the Twin Cities metropolitan area. Metro Transit asked the court to affirm the order of the district court granting summary judgment. In response to Appellant's argument, I'd like to focus on two areas, Your Honors, the legal framework and the factual record. Appellant's position on how the court should analyze the statutes at issue in this case is simply wrong. Appellant asserts discrimination claims under three statutes, the ADA, the Rehabilitation Act, and the Minnesota Human Rights Act. All of these statutes require that no qualified individual with a disability shall be excluded from participation or deny the benefits of the services of the public entity. The U.S. Supreme Court adopted the standard by which to determine whether someone was excluded from benefits from participation or denied the benefits, and that is the meaningful access to the service standard that the court referenced. I submit this is a mixed question of law, in fact, and the operative governing cases here are the Alexander v. Coate, I might be mispronouncing that, which is U.S. Supreme Court, and then there's many Eighth Circuit cases also applying the meaningful access standard and, in fact, affirming summary judgment under that standard. The Loy case, I think, is the most relevant here. Counsel, this is Judge Loken. The $64 question, of course, is if this was before the Supreme Court, and the question was, was this set of facts, did this set of facts constitute meaningful access or not? Would the Supreme Court say that that ultimate question is one of fact or law? And they rarely give us much guidance on that, to the point where we had, when we had this issue in my early days on the question of seizure, we had split majorities, and you had to go to the Supreme Court cases and dissect whether they used the word found or concluded to decide, as we did, that seizure is, in fact, a fact-intensive question of law. Now, what case has done that homework on this issue, to your knowledge? I'm trying to think if the Eighth Circuit cases discussed that, whether it's a question of fact or law. I know Loy does not. Right. I don't know that that is specifically addressed in the cases applying the meaningful access standard. However, those cases, as many cases on summary judgment, found that the facts did not meet the threshold in which to submit the issue to the jury, that it could be found on the undisputed record as a matter of law, that the plaintiff was provided meaningful access under the statutes. The disconnect that comes, your honors, from appellant is that when looking at the implementing regulations, the appellant then supplants the meaningful access standard under the statute with a strict liability standard under the regulations, and argues that we shift the violated the regulations, and that essentially replaces the analysis of whether Mr. Siegel was denied meaningful access. As appellant also states, on the other hand, the statute should be viewed through the lens of the regulations, and no one is disputing that the implementing regulations are covered within the statutory cause of action, but they don't supplant the meaningful access standard. This is Judge Erickson. I think that this supplantation question is an interesting one, but in the end, the violations of the regulations is evidence, right? Because it informs the decision that ultimately has to be made. In this case, what they're claiming essentially is that there are 150 points of evidence, and that that's sufficient to give rise to a jury question on what appears to be a mixed question, a fact-bound question, that may ultimately be a question of law, but it's bound up in the facts such that somebody's got to make a determination as to what the facts are. Now, you claim the facts are undisputed, so that must mean to me that you admit that there are at least 150 violations of the regulation, and that as a matter of law, that is insufficient to give rise to a jury question. Am I wrong on that? Slightly. The 150 number is the complaints that were filed or submitted by appellant, and it is not disputed that appellant submitted 150 complaints. It is also clear in the record that of those 150 complaints, they were reviewed extensively by the director of bus operations, and she was able to verify 74 of the complaints as being internal violations of their policy. Now, I want to clarify that when I say verified, that was an internal standard imposed by the Metropolitan Council to figure out how to objectively measure these complaints, and Ms. Bailey, the director of operations, considered something verified. If she could find Mr. Siegel at the bus stop, and if his body was not within the frame of the bus door, she verified the complaint. It is very important, Your Honors, that the verified complaints, so of the 74 that were determined that potentially a bus operator did not fully comply with the policy, those 74 were not verified because they necessarily impacted the plaintiff's access to the bus. In fact, we know that some number of those 74 did not impact his access to the bus. If you look at Appellee's Appendix at A1083-1086, those are four examples of verified complaints where Mr. Siegel was standing right by the bus, but for some reason, Ms. Bailey verified the complaint. Counsel, this is Judge Kelly. Are you getting into fact-finding now? As I understood at the district court level, you didn't contest that there were 150 allegations of violations, and now I hear you sort of parsing them through as a factual matter. Is that appropriate at this stage? I'm sorry, Appellee is willing to concede for purposes of the summary judgment motion, and we did, that the 150 complaints will concede that they were violations. Although we did look at the factual record and there was a lot of record evidence about the verifications. But what is missing from that number is the context, the larger context. And Appellant says that number over and over in his briefing, but never puts it in context with a lot of other data in the record that can inform this analysis. The 150 complaints by Mr. Siegel need to be looked at in the context of his rides. This was a three and a half year period where Mr. Siegel rode the bus and received service and received the same level of service as other riders. The total number of rides were 1,791, so almost 1,800 rides. 1,641 rides were no incident, were no complaint, no allegation. So he rode the bus daily, sometimes multiple times a day. And there's over 1,600 rides that he had no incident. You have to look at the other facts in the record as well. As the Meaningful Access Standard has been interpreted, this does not guarantee a disabled individual to have perfect service, but comparable service. Service that achieves the same level as a non-disabled rider. And we have evidence that aside from Mr. Siegel's complaints, first of all, there's only in a four and a half year period, there's 150 complaints about the bus stopping from other disabled riders. If you look at the total number of rides by other non-disabled individuals, you have to put that in context. I'm sorry. Looking for my numbers. And you have to look at all these statistical comparisons here. Because there are a number of complaints by riders in the 285 million rides provided over this time period. So what we are arguing to the court, and what the district court correctly found, is that by looking at the factual record here, and taking into account all of the context from Mr. Siegel, and all of the complaints and the normal issues that riders have to look at comparable service, that Mr. Siegel... So this is Judge Kelly again. What should we take away from the numbers of able-bodied or non-disabled riders? What does that number tell us? Because it seems to me, one, it's significantly larger than the number of disabled folk who are using the system. And two, the complaint is just fundamentally different than an ADA complaint. Right. And Metro Transit is not saying that they're... We don't have the same issues, obviously, with non-disabled riders. And we're not trying to say that the issues are the same. Based on the data we have, the value of looking at the non-disabled riders is that it shows that service is not perfect. It is not guaranteed perfect service. No one has perfect service. And we did not look at the complaints contrary to what Mr. McPherson argued in his brief. We did not look at the complaints or try to compare the complaints of all riders to all aspects of bus services. But we looked at the complaints of all riders as to not following protocols at the bus stop. So that was the best comparison we could make to this particular issue at the bus stop. And so what it does is it attempts to look at what is the level of achievement that we are striving for here. And you cannot look at this in a vacuum with Mr. Siegel. Because, again, it's not perfect service for anyone. And he's not entitled to greater service than a non-disabled rider. This is Judge Erickson again. Is it really fair to look at what non-disabled people's nuisances are and the number of complaints that they file? Because, you know, there's a lot of times as a non-disabled person where there may be non-compliance by Metro Transit. And you are just slightly impacted by it as a non-disabled person. But as a disabled person, you're completely deprived of service. And aren't we really at that point comparing apples to kumquats? I mean, it seems relatively meaningless. And I get that you're not entitled to a perfect system. That is just one data point, Your Honor. We're not relying on this issue of comparing Mr. Siegel's complaints to non-disabled primarily. The more important and the more relevant context, Your Honor, is Mr. Siegel's rides. And Mr. Siegel's service. And he, as I mentioned... Counsel, this is Judge Loken. Don't ignore that when the non-disabled rider has only one bus to get to work and that bus doesn't show that day, that's an equivalent deprivation. So just non-disabled people don't only have nuisance complaints. And I am not suggesting this is a nuisance complaint at all. What I want to make clear is that I think Judge Erickson said it's a deprivation of service. Mr. Siegel testified that over three and a half years, he was never late for work more than a handful of times. We don't know that he... he doesn't know that he ever missed a bus. This issue of him complaining that a bus did not stop precisely at the T sign, the point is he was not limited in his service or deprived of meaningful access. He rode that bus every day. He has no testimony that he was not able to access the bus, that he could not get to where he was going. But in fact, the vast majority of the time, almost 100% of the time, he made it to his work. He made it to his meetings. He was not impacted in the way of being denied the bus services. And again, that is not to trivialize the importance of the policy and the importance of identifying the bus. And Metro Transit has never taken that position. Metro Transit has submitted evidence, overwhelming evidence, that Mr. Chia, who Mr. McPherson mentioned, said that Met Council is complying with the regulations. He found no systemic violation and the operators are trained to proficiency. So again, not trivializing the concerns by Mr. Siegel, he was not deprived of service because of these relatively small number of issues where perhaps the bus did not stop precisely at the T-Sign. Of course, there were more serious occasions where the bus didn't stop at all, but there are a number of times where they just didn't stop at the T-Sign. His access was not impaired. And on the full record, the court correctly found that he had meaningful access. Over three and a half years, this was his primary mode of transportation. And he was afforded service. I want to just, if I could... Your time is up. Okay, the clock went off. We have a long morning. Thank you, Mr. McPherson for a rebuttal. Thank you, Your Honor. I'd like to return to the original question that the court posed to me about whether this is a fact question or a question of law. And I think it's true this is a mixed question, but ultimately the question of whether Metro Transit provided meaningful access is a question for the jury based on all the facts in the record. At this point, this case comes to you following Defendant's Metro Council's summary judgment motion, which means that the facts as asserted by Mr. Siegel and supported in the record must be taken as true. I believe that the way the issue of meaningful access in a situation where there are regulations involved, how that should be handled with the jury is the court should instruct the jury about the requirement to provide meaningful access, and the court should also instruct the jury about the applicable regulations. Why is that? Because Congress and the Department of Transportation has determined that the regulations are the necessary minimum requirements, standards that must be met in order to provide meaningful access. If there is a deafblind person waiting at the bus stop and trying to identify whether a bus that arrives is his bus or not, he cannot do that unless the bus stops and announces the route. He can't see any sign on the bus. He can't hear any other announcement. That is the only way that can happen. Metro Transit does trivialize the problems that Mr. Siegel experienced, and we've submitted video recordings showing examples of the many occasions where buses simply passed Mr. Siegel by. Mr. McPherson, this is Judge Kelly. I have a question about the other regulation that you cite regarding training to proficiency. Is that the same type of regulation as the one that requires the means for a disabled person to identify the bus? In other words, would that be presented to the jury in the same way? I don't believe it would be presented in the same way, but whether drivers were trained appropriately is a piece of evidence that the jury could consider, and in order to do that, it needs to be told and understand the standard that the Department of Transportation has set. It's not sufficient to simply provide some measure of training, but the training has to be effective. What we have in this case, and what I believe the jury should be told, and is a relevant fact question, is yes, Metro Transit did some training. It took them more than a year to do the first training, and it's only done it once with regard to deafblind people. But the facts show, the facts in the record show, that that training and publishing their where to stop bulletin, which they republished four times, did not affect the complaints. The problems continued. Those are facts that, for the purpose of this appeal, are not in dispute. So, I believe in answering your question, no, there are different kinds of standards, but it is still a relevant fact. I think to return to a question that was asked earlier about whether this is a fact question or a legal question, I would direct the court's attention to the Hillersheim decision, where this court determined that the failure to comply with the minimum width standards provided the guidance necessary to determine whether the store was accessible, number one, and number two, decided that the district court had erred by granting summary judgment in the face of 15 violations. As I said earlier, in this case, Mr. Siegel has asserted 10 times that number. It's 8% of all his rides. It may not seem like much to Metro Transit, but to Mr. Siegel it was significant. It meant every week, every day when he went to the bus stop, he never knew whether the bus was going to stop there. He never knew whether he was going to have to chase the bus and expose himself to injury, pound on the door to get them to open, and we've included video recordings showing those incidents. If I may conclude, Your Honor, this case, Mr. Siegel asks this court to reverse the district court's decision. We think that's important, because if it affirms the district court's decision, it is sending a message to transit agencies in this circuit and around the country that 150 violations doesn't matter. You will not be held accountable for violating Department of Transportation regulations that set minimum standards. We ask the court not to do that. We ask the court to reverse the district court's decision. Thank you. Thank you, counsel. The case has been fairly brief and very well argued, and we will take it under advisement.